HENDERSON ET AL., APPELLEES, *v.* LAWYERS TITLE
INSURANCE CORPORATION, APPELLANT.

[Cite as *Henderson v. Lawyers Title Ins. Corp.,*
108 Ohio St.3d 265, 2006-Ohio-906.]

(No. 2004-0574—Submitted March 8, 2005—Decided March 15, 2006.)

ALICE ROBIE RESNICK, J.

{¶ 1} This appeal stems from the denial of a motion to enforce an arbitration clause in certain title insurance policies that were issued by defendant-appellant, Lawyers Title Insurance Corporation, in connection with two residential real estate transactions involving plaintiffs-appellees, Miles and Patricia Henderson.

{¶ 2} On May 26, 1999, the Hendersons entered into an agreement to purchase a home in South Russell. They agreed with the sellers to pay half of the premium for an owner's policy of title insurance to be provided by Lawyers Title. The real estate broker on this transaction, Realty One, Inc., provided Lawyers Title with a copy of the purchase agreement and requested that a commitment for title insurance be issued to the Hendersons. On June 22, 1999, Lawyers Title issued a commitment for an "ALTA [American Land Title Association] Owner's Title Insurance Policy (10–17–92)" and delivered it to the mortgage lender, Third Federal Savings & Loan Association. The Hendersons were not provided with a copy of the commitment. Some time after the closing on July 30, 1999, the Hendersons received their title insurance policy, along with the deed to the South Russell property.

{¶ 3} On August 22, 1999, the Hendersons entered into an agreement to sell their residence in Shaker Heights. They agreed with the buyers, Alfred and Demetria Johnson, to pay half of the title insurance premium on this second real

estate transaction, which closed on September 16, 1999. Since an owner's policy of title insurance insures record title in the purchaser of the property, Lawyers Title sent the policy to the Johnsons. The Hendersons did not receive any title documents in connection with the sale of the Shaker Heights property.

{¶ 4} On January 25, 2002, the Hendersons filed a class-action complaint in the Cuyahoga County Court of Common Pleas on behalf of themselves and all others similarly situated. In their complaint, the Hendersons alleged that under the applicable rate schedule filed by Lawyers Title with the Ohio Department of Insurance, they were entitled to but did not receive a 40 percent reissue credit against the premiums they paid for the title insurance policies on the South Russell and Shaker Heights properties. The Hendersons sought certification of a class consisting of all Ohio residential customers of Lawyers Title who likewise qualified for but did not receive the appropriate reissue credit.

{¶ 5} On August 16, 2002, Lawyers Title moved for an order compelling the Hendersons to proceed to arbitration.[1] In support of its motion, Lawyers Title relied on an arbitration clause within the title insurance policies, which states that "either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association."[2] The parties then submitted a series of memoranda in which they progressively sharpened their arguments with regard to the validity of the arbitration clause. Focusing primarily on the South Russell policy, they ultimately agreed that a

---

1. Lawyers Title removed the action to the United States District Court for the Northern District of Ohio on March 6, 2002. Finding that it lacked jurisdiction over the subject matter, however, the federal court remanded the cause to the Cuyahoga County Court of Common Pleas. See *Henderson v. Lawyers Title Ins.* (June 28, 2002), N.D.Ohio No. 1:02 CV 422.

2. {¶ a} The arbitration clause reads in its entirety:
   {¶ b} "Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.
   {¶ c} "The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.
   {¶ d} "A copy of the Rules may be obtained from the Company upon request."

valid contract for title insurance had been formed, but disagreed on whether the arbitration clause was an enforceable part of the contract.

{¶ 6} Following an evidentiary hearing on January 23, 2003, the trial court denied Lawyers Title's motion to compel arbitration. In so doing, however, the court invalidated the entire South Russell policy, not just the arbitration clause. Thus, the trial court found:

{¶ 7} "1. The issuance of the title insurance policy does not occur until after closing, sometimes 60–120 days thereafter. The buyer of the policy does not have the opportunity to review the policy prior to closing and therefore does not know the terms of the policy. For this reason, the Court finds that the policy cannot be binding; consequently, the arbitration clause cannot be binding.

{¶ 8} "2. * * * [B]ecause there is not an opportunity to review the policy prior to its issuance, there was no meeting of the minds. Without a meeting of the minds, Plaintiffs have overcome the presumption of arbitration and the Court will retain jurisdiction over this matter."

{¶ 9} The trial court also found that because the Hendersons had paid half of the premium for the Shaker Heights policy, they "have standing to bring their Complaint on their status as * * * seller [of the Shaker Heights property] * * * even though the seller of property derives no benefit from the title insurance."

{¶ 10} The court of appeals affirmed the judgment of the trial court, for similar reasons. After confirming that the Hendersons did not receive a copy of the South Russell policy until after they had paid their share of the premium and the transaction had closed, the court of appeals held that the Hendersons "never expressed assent to the terms contained in [that] title policy. Without a meeting of the minds, the parties had not formed a valid contract." 2004-Ohio-744, 2004 WL 308107, at ¶ 13. With regard to the Shaker Heights policy, the court of appeals concluded that "there was no agreement by the plaintiffs to be bound by an arbitration clause in a title insurance policy they never received." Id. at ¶ 15.

{¶ 11} The cause is now before this court upon the acceptance of a discretionary appeal.

{¶ 12} For the following reasons, which are substantially different from those of the courts below, we conclude that the arbitration clause in neither policy is binding on the Hendersons.

## I
### THE SOUTH RUSSELL POLICY
#### A
##### Formation of Contract

{¶ 13} In holding that "the parties had not formed a valid contract," the court of appeals theorized, as did the trial court, that the delivery of a title insurance

policy in advance of its effective date is essential to the validity of the contract. For quite some time, however, the law in Ohio has been to the contrary.

{¶ 14} "A contract of insurance is consummated upon the unconditional acceptance of the application of the insured by the insurer." *Hartford Fire Ins. Co. v. Whitman* (1906), 75 Ohio St. 312, 319, 79 N.E. 459. "And where nothing is said, in the negotiation for insurance, about special rates or conditions, it may be presumed that those which were usual and customary, were intended." *Newark Machine Co. v. Kenton Ins. Co.* (1893), 50 Ohio St. 549, 556, 35 N.E. 1060.

{¶ 15} In fact, "[t]he very reason for sustaining such contracts [pending delivery of the policy] is, that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted. It is sufficient if one party proposes to be insured, and the other party agrees to insure, and the subject, the period, the amount, and the rate of insurance is ascertained or understood, and the premium paid if demanded. It will be presumed that they contemplate such form of policy, containing such conditions and limitations as are usual in such cases, or have been used before between the parties. This is the sense and reason of the thing, and any contrary requirement should be expressly notified to the party to be affected by it." *Eames v. Home Ins. Co.* (1877), 94 U.S. 621, 629, 24 L.Ed. 298.

{¶ 16} A valid contract was formed in this case when Lawyers Title acceded to the Hendersons' request for an owner's policy of title insurance. And since the parties did not negotiate for any special terms or conditions, they are presumed to have intended that the ensuing policy would include the usual and customary provisions found in similar title insurance policies. Thus, contrary to the holdings below, the delivery of the policy after closing does not vitiate the parties' agreement for insurance. Instead, to the extent that it contains the usual and customary terms, the policy is simply a reflection of the parties' intent and a memorial of their agreement.

{¶ 17} Accordingly, we hold that a title insurance policy that is issued in response to an unqualified request for coverage, but is not delivered to the insured until after the closing, is binding to the extent that it contains the usual and customary terms found in similar insurance policies.

B

Validity of Arbitration Clause

1

Usual and customary terms

{¶ 18} Lawyers Title argues that "[a]s a matter of usual and customary practice, both nationally and in this state, title insurance policies have included

arbitration provisions since at least 1987 when ALTA promulgated the original version of the 1992 Owner's Policy." In support, Lawyers Title relies on the testimony of its vice president and area manager, Terry Endress. Specifically, Endress stated at the motion hearing that an arbitration clause appears in the last three of the five form policies that were promulgated by ALTA and approved by the Ohio Department of Insurance between 1970 and 1992 and that it was the practice of Lawyers Title in 1999 to issue the most recently approved ALTA policy when a customer made an unconditional request for an owner's policy of title insurance.

{¶ 19} Lawyers Title forgets, however, that Endress also testified that all five ALTA policies were available for purchase from Lawyers Title in 1999, that arbitration provisions "are in some policies, and they are not in other policies," and that as a matter of routine practice, Lawyers Title will delete an arbitration clause on request at no additional cost. Further, Endress confirmed that Lawyers Title uses its 1992 forms as well as the 1970 forms, that other title insurance companies also issue policies with and without arbitration clauses, and that arbitration clauses are used in some but not in all transactions.

{¶ 20} In light of this additional testimony, the inclusion of arbitration clauses in title insurance policies does not appear to be as uniform and consistent as Lawyers Title suggests. It was not Endress's testimony that the more recent ALTA policies, which include arbitration clauses, have supplanted the previous policies, which do not. Instead, all five versions of ALTA policies, some with and some without arbitration provisions, continue in general use. To say that the use of an arbitration clause may vary from one transaction to the next, or that some title insurance policies but not others may be issued with an arbitration clause, is hardly sufficient evidence of a usual and customary practice.

{¶ 21} In its reply brief, Lawyers Title argues that "[u]sual and customary does not imply unvarying use." But even a broadly construed definition of "usual and customary" that tolerates some degree of practical variation would still have to include elements of consistency and regularity in order to retain its essential meaning. Those elements do not appear from Endress's testimony.

{¶ 22} Accordingly, Lawyers Title's assertion that an arbitration clause is a usual and customary term in title insurance policies is not supported by the record.

## 2

### Federal Arbitration Act

{¶ 23} Most of Lawyers Title's contentions with regard to the applicability of the Federal Arbitration Act, Section 1 et seq., Title 9, U.S.Code, are directed at aspects of the decisions below that we have not adopted. Beyond that, Lawyers

Title argues that if the usual and customary terms of a title insurance policy are binding, even though the policy was delivered after its effective date, a "standard arbitration provision[ ] therein must be, too." According to Lawyers Title, "[a]pplying contracting principles such as [the] 'meeting of the minds' standard in ways specially tailored to exclude arbitration while allowing the balance of the contract to stand, violates the tenets of *Doctor's Associates* [*Inc. v. Casarotto* (1996), 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902] and its predecessors."

{¶ 24} Section 2 of the Federal Arbitration Act ("FAA") states that written provisions for arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Section 2, Title 9, U.S.Code. In *Doctor's Assoc., Inc. v. Casarotto* (1996), 517 U.S. 681, 683, 116 S.Ct. 1652, 134 L.Ed.2d 902, the United States Supreme Court held, "Montana's first-page notice requirement, which governs not 'any contract,' but specifically and solely contracts 'subject to arbitration,' conflicts with the FAA and is therefore displaced by the federal measure."

{¶ 25} In so holding, the high court explained, " '[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of § 2].' " Id. at 685, 116 S.Ct. 1652, 134 L.Ed.2d 902, quoting *Perry v. Thomas* (1987), 482 U.S. 483, 493, 107 S.Ct. 2520, 96 L.Ed.2d 426, fn. 9. (Bracketed words sic and emphasis added in *Perry*.)

{¶ 26} In other words, "[c]ourts may not * * * invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. * * * Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed ' "upon the same footing as other contracts." ' " (Emphasis sic.) Id. at 687, 116 S.Ct. 1652, 134 L.Ed.2d 902, quoting *Scherk v. Alberto–Culver Co.* (1974), 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270, quoting H.R. Report No. 96, 64th Cong. 1st Session (1924) 2.

{¶ 27} The problem with Lawyers Title's argument, and specifically its reliance on *Doctor's Assoc.* and similar cases, is that we are not invalidating a "standard arbitration provision." To the contrary, we are invalidating the present arbitration clause precisely because the parties contracted for a standard policy of title insurance, which was not shown to include an arbitration clause. In so doing, we have applied a principle under which standard terms in a title insurance policy will be enforced in the commonplace situation in which the proposed insured makes an unqualified request for coverage, and the insurer then issues a policy without further negotiation. The corollary, of course, is that any nonstandard term that appears in the ensuing policy will be invalidated as contrary to the

parties' intent. To the extent that the application of this principle can be said to result in the imposition of a requirement for notice or advance delivery of the policy, that requirement governs not just arbitration provisions but any nonstandard term in a title insurance policy. While such a requirement could be loosely characterized as a special law applicable to nonstandard provisions in title insurance policies, it is not a special law applicable only to arbitration provisions.

{¶ 28} Lawyers Title seems to be asking for special protection for arbitration provisions. If we applied the FAA as Lawyers Title suggests and enforced a nonstandard arbitration clause, then no uncontracted-for special term in a title insurance policy would be enforceable except arbitration. However, the FAA neither declares that all contracts must include an arbitration clause nor forces arbitration provisions upon those who do not agree to them. Nor does it require that general principles governing the formation and validity of contracts be relaxed in order to sustain arbitration provisions. Section 2 simply requires that arbitration provisions be placed on a par with other contract provisions. While the law may encourage parties to settle their contractual disputes expeditiously through arbitration, it remains a basic principle that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409. See, also, *AT & T Technologies, Inc. v. Communications Workers of Am.* (1986), 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648; *Gerig v. Kahn,* 95 Ohio St.3d 478, 2002-Ohio-2581, 769 N.E.2d 381, ¶ 14; *Council of Smaller Ent. v. Gates, McDonald & Co.* (1998), 80 Ohio St.3d 661, 665, 687 N.E.2d 1352.

{¶ 29} We conclude, therefore, that the principles being applied in this case are not in conflict with Section 2 of the FAA, since they do not condition the enforceability of arbitration agreements on compliance with a special requirement applicable only to arbitration provisions.

3

Notice and estoppel

{¶ 30} Lawyers Title claims that even before the Hendersons received their policy, they were "under constructive notice * * * of [its] terms (including arbitration)." In so doing, Lawyers Title points to the fact that the commitment letter identified the policy to be issued as an ALTA 1992 Owner's Policy and argues that the Hendersons could have obtained a form of that policy "from readily available public or private sources." We disagree.

{¶ 31} The commitment letter merely informed its recipient that a 1992 owner's policy would be issued. It did not contain any information as to where such a policy could be obtained or examined, or even that such a policy was

accessible in preprinted form. In any event, the Hendersons cannot be charged with knowledge of the information contained in the commitment letter because they never received it. Lawyers Title delivered the commitment to Third Federal Savings & Loan Association; it did not provide the Hendersons with a copy. Moreover, there is no evidence to suggest that the Hendersons were anything other than typical unsophisticated purchasers, who, as Lawyers Title puts it, "have little knowledge of customs and practices characteristic of a particular [title insurance] transaction." Thus, there is no basis upon which notice of the arbitration clause can be imputed to the Hendersons prior to their receipt of the actual policy.

{¶ 32} Lawyers Title further argues, however, that after they received their policy, the Hendersons "held it for more than three [sic; two] years without reading it." Lawyers Title contends that under applicable insurance law, insured parties like the Hendersons are "deemed to have accepted [the] terms [of an insurance policy], including arbitration, after they have had possession of the policy document for a reasonable time without objecting to its terms." Thus, the fact that the Hendersons "had ample opportunity to read the proposed policies * * * estops them now from complaining that the terms therein should not be enforced." We disagree under the facts of this case.

{¶ 33} In cases involving automobile insurance, courts have concluded that insureds have a duty to review their policies and object to unacceptable terms within a reasonable time. Thus, in *Graham v. State Farm Mut. Auto. Ins. Co.* (Del.1989), 565 A.2d 908, the Supreme Court of Delaware held an arbitration clause in an automobile insurance policy enforceable even though the insureds received the policy after the premiums had been paid and coverage had begun. In so doing, the court explained that "if the Grahams had read their policy after receiving it, they would have discovered the arbitration clause. If they then believed this clause to be sufficiently objectionable, they could have cancelled the policy and sought coverage with another insurer on more agreeable terms. Nevertheless, the Grahams continued to accept coverage and pay premiums for two years before the accident occurred." (Footnote omitted.) Id. at 913.

{¶ 34} However, as amicus curiae Ohio Insurance Institute convincingly demonstrates, the situation in this case is distinguishable because of the "unique characteristics of title insurance policies." Specifically, the Institute explains, "Title insurance coverage is provided for a continuing and indefinite period of time in exchange for a one-time premium payment, without the need to renew the policy. On the other hand, property and casualty insurance coverage is provided for a relatively short specified policy period, subject to renewal for additional periods upon the agreement of the insured and insurer and the payment of additional premiums."

{¶ 35} In this case, the Hendersons did not receive a copy of their policy until weeks after the closing. At that point, the Hendersons had already purchased their new home in South Russell. Even if they had carefully read the policy the day they received it, the Hendersons could not have voided their contract with Lawyers Title. They had paid their share of the one-time premium and had no recourse. They could not have canceled their policy and switched to another carrier, at least not without forfeiting their premium. That fact distinguished the Hendersons from a purchaser of a homeowner's or automobile policy.

{¶ 36} We conclude, therefore, that the arbitration clause in the South Russell policy is not binding on the Hendersons.

## II
## THE SHAKER HEIGHTS POLICY

{¶ 37} In holding that the arbitration clause in the Shaker Heights policy is not enforceable against the Hendersons, the court of appeals reasoned that the Hendersons cannot "be bound by an arbitration clause in a title insurance policy they never received. The total absence of even the contract is indicative of the lack of mutual assent." 2004-Ohio-744, 2004 WL 308107, at ¶ 15.

{¶ 38} Lawyers Title argues that the court of appeals ignored this court's holding in *Gerig v. Kahn*, 95 Ohio St.3d 478, 2002-Ohio-2581, 769 N.E.2d 381. In *Gerig*, we held that "a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract." Id. at ¶ 19. According to Lawyers Title, *Gerig's* holding should be applied in this case because the Hendersons, who are not parties to the Shaker Heights policy, "derive their interest through a hypothetical dispute the Johnsons have with [Lawyers Title] regarding the Johnsons' right to a reissue rate." Thus, "[i]f [the Hendersons] wish to enforce the Johnsons' rights [under the Shaker Heights policy], [they] must accept and abide by the terms of [that] Policy."

{¶ 39} We agree that the court of appeals neglected to consider whether the holding in *Gerig* applies to a seller's claim for a reissue credit on amounts paid toward the purchase of a title insurance policy that contains an arbitration clause. But coincidentally the court of appeals did address that precise question in *Simon v. Commonwealth Land Title Ins. Co.*, 8th Dist. No. 84553, 2005-Ohio-1007, 2005 WL 563816, which was decided two days after oral arguments were held in this case.[3]

---

3. On September 7, 2005, we allowed an appeal from the appellate court's decision in *Simon* and held the cause for a decision in this case. 106 Ohio St.3d 1503, 2005-Ohio-4605, 833 N.E.2d 1246.

{¶ 40} In *Simon,* the court of appeals distinguished *Gerig* on the following grounds:

{¶ 41} "Commonwealth Land Title argues the trial court abused its discretion by not applying *Gerig v. Kahn.* *Gerig v. Kahn* stands for the proposition that a non-signatory can be bound to provisions of an agreement when the non-signatory seeks a declaratory judgment as to its rights and obligations under the agreement itself. The Simons are not claiming or seeking a declaration of their rights under the policy but rather are seeking to declare and enforce their rights under Commonwealth Land Title's rate schedule which is filed with [the Ohio Department of Insurance] pursuant to R.C. 3937.03. It is the cost of the premiums that [is] at issue and their rights to be so informed of the discount and to receive the discount." (Citation omitted.) Id. at ¶ 36.

{¶ 42} We agree with this analysis. The holding in *Gerig* applies when a nonparty is "seeking a declaration of the *signatories'* rights and obligations *under* the contract." In this case, as in *Smith,* the sellers' alleged rights with regard to a reissue credit exist independently of the purchasers' rights and obligations under the policy because the sellers are not parties to the insurance contract and their rights arise instead from the terms of the insurer's rate schedule, which does not contain a provision for arbitration. Moreover, when viewed from this perspective, the issue whether the Hendersons have standing "to enforce whatever contractual rights the [Johnsons] * * * may have to a reissue rate," as raised by Lawyers Title, is obviated. Since the Hendersons are not claiming under the Johnsons' policy, it is of no consequence whether they have standing to do so.

{¶ 43} But there is another, more basic reason why *Gerig* cannot be applied in this case. Even if we assume that the Hendersons are seeking a declaration of the Johnsons' rights under the Shaker Heights policy, the Hendersons would not be bound by any term in that policy that is not enforceable against the Johnsons. " 'Where the contract contains an arbitration clause which is legally enforceable, the general view is that the beneficiary is bound thereby to the same extent that the promisee is bound.' " *Dist. Moving & Storage Co., Inc. v. Gardiner & Gardiner, Inc.* (1985), 63 Md.App. 96, 102–103, 492 A.2d 319, quoting Williston on Contracts (3d Ed.1957), Section 364A (footnote omitted), affirmed (1986), 306 Md. 286, 508 A.2d 487. See, also, *Zac Smith & Co. v. Moonspinner Condominium Assn.* (Fla.App.1985), 472 So.2d 1324, 1324–1325; *Rae v. Air–Speed, Inc.* (1982), 386 Mass. 187, 196, 435 N.E.2d 628 (beneficiary "stands in the shoes" of promisee); *Thomson–CSF, S.A. v. Am. Arbitration Assn.* (C.A.2, 1995), 64 F.3d 773, 779.

{¶ 44} Accordingly, Lawyers Title argues, as it must, that the arbitration clause in the Shaker Heights policy is enforceable against the Johnsons: "As between the Johnsons and [Lawyers Title], the 1992 Owner's Policy includes a

valid arbitration requirement—[Lawyers Title] has shown that the usual and customary policy was issued in the Sale [of the Shaker Heights property]." But we have already concluded that Lawyers Title has failed to demonstrate that the usual and customary title insurance policy includes an arbitration clause. Thus, the arbitration clause in the Shaker Heights policy is no more enforceable against the Johnsons than the arbitration clause in the South Russell policy is enforceable against the Hendersons. And since the arbitration clause in the Johnsons' policy is not binding on them, it could not be enforced against the Hendersons in their supposed capacity as derivative claimants.

{¶ 45} We conclude, therefore, that the arbitration clause in the Shaker Heights policy is not binding on the Hendersons.

{¶ 46} Accordingly, for the reasons stated herein, the judgment of the court of appeals is affirmed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment affirmed,
and cause remanded for
further proceedings.

MOYER, C.J., PFEIFER, O'CONNOR and EDWARDS, JJ., concur.

LUNDBERG STRATTON and LANZINGER, JJ., dissent.

JULIE A. EDWARDS, J., of the Fifth Appellate District, sitting for O'DONNELL, J.

---

**LANZINGER, J., dissenting.**

{¶ 47} I agree with the majority that a title insurance policy issued in response to an unqualified request for coverage but not delivered until after the closing is binding. But I dissent because, in my view, the evidence establishes that an arbitration clause is a usual and customary term in the 1992 American Land Title Association ("ALTA") owner's policy for title insurance.

{¶ 48} As a general rule, federal and state courts encourage arbitration to resolve disputes. *ABM Farms v. Woods* (1998), 81 Ohio St.3d 498, 500, 692 N.E.2d 574. On the federal level, the Federal Arbitration Act ("FAA") shows the liberal federal policy favoring arbitration. Section 1 et seq., Title 9, U.S.Code; *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.* (1983), 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765. In *Cone,* the United States Supreme Court stated that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Id. Likewise, Ohio's policy of encouraging arbitration has been declared by the legislature through the Ohio Arbitration Act, R.C. 2711.01 et seq. This statute mirrors the FAA in many respects. R.C.

2711.01 states that arbitration clauses "shall be valid, irrevocable, and enforceable" except on grounds applicable to revocation of any contract.

{¶ 49} ALTA creates forms of title insurance policies for the Ohio Department of Insurance to approve and for title companies in the state of Ohio to use. In keeping with the federal and state trend toward favoring arbitration as a means to settle disputes, ALTA began incorporating arbitration clauses into its title insurance policies in 1987. Furthermore, each of the title insurance companies in Ohio uses the approved ALTA forms.

{¶ 50} The majority emphasizes the testimony of Terry Endress, the vice president and area manager of Lawyers Title, and specifically relies on his statement that arbitration provisions are "in some policies, and they are not in other policies" to support invalidating the arbitration provision. However, by highlighting his statement, the majority obscures the fact that arbitration provisions have been in three of the last five ALTA title insurance policies, promulgated in 1970, 1984, 1987, 1990, and 1992. Although arbitration provisions are not in the 1970 or 1984 versions, they *are* in each policy form beginning in 1987. Thus, while I do not dispute that arbitration provisions were not a usual and customary term ten years ago, their inclusion in the 1987, 1990, and 1992 policies shows the title insurance industry's intent to establish arbitration as a usual and customary feature. Recognizing this intent comports with both federal and state policy favoring arbitration.

{¶ 51} Endress testified that the company's custom and routine practice is to issue the most recently approved ALTA policy when a customer makes an unqualified request for an owner's policy of title insurance. When a contract for an insurance policy is entered into, with nothing said about the terms, the parties are presumed to intend that the policy will contain the usual and customary provisions found in insurance policies in like cases. *Avemco v. Eaves* (1990), 67 Ohio App.3d 563, 568, 587 N.E.2d 900, citing *Newark Machine Co. v. Kenton Ins. Co.* (1893), 50 Ohio St. 549, 556, 35 N.E. 1060.

{¶ 52} In the present case, the Hendersons made an unqualified request for a title insurance policy. For Lawyers Title, the usual and customary practice was that, following an unqualified request for title insurance, it would issue the most recently approved ALTA policy. At the time of the Hendersons' transactions in 1999, the most recently approved policy was the 1992 ALTA policy, which contained an arbitration clause. The majority suggests that in order for a term to be usual and customary, there must be consistency and regularity in its use. Lawyers Title established that as a routine practice, it issues title insurance policies containing arbitration provisions following an unqualified request for coverage and that arbitration provisions have been in all ALTA policies since 1987. I would hold that there is evidence of consistent and regular use to

establish arbitration as a usual and customary term and would, therefore, reverse.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

———

Ulmer & Berne, L.L.P., Marvin L. Karp, and David D. Yeagley; Sonkin & Koberna Co., L.P.A., Mark R. Koberna, and Rick D. Sonkin, for appellees.

Collins & Scanlon, L.L.P., Thomas J. Scanlon, Tim L. Collins, and M. Scott Wilson, for appellant.

Benjamin, Yocum, & Heather, L.L.C., Timothy P. Heather, and Brian A. Lee, urging reversal for amicus curiae Ohio Association of Civil Trial Attorneys.

Vorys, Sater, Seymour & Pease, L.L.P., William D. Kloss, and Michael Thomas, urging reversal for amicus curiae Ohio Insurance Institute.

Thompson Hine, L.L.P., William C. Wilkinson, and Jennifer E. Short, urging reversal for amicus curiae Ohio Land Title Association.