OPINION
{¶ 1} This is an appeal from the judgment of the Franklin County Court of Common Pleas denying the motion of the state of Ohio to compel R.J. Reynolds Tobacco Company ("RJR"), Lorillard Tobacco Company ("Lorillard"), and Philip Morris USA, Inc. ("Philip Morris"), to make full payments ("release motion") under the Master Settlement Agreement ("MSA"), and denying as moot the diligent enforcement determination motion of the state of Ohio and granting a motion of the appellees to compel arbitration of the release motion.
 {¶ 2} The undisputed relevant facts, as set forth in the trial court opinion, are as follows: In 1998, 46 states (including Ohio), [1] the District of Columbia, the Commonwealth of Puerto Rico, and four territories ("Settling States"), and four major *Page 3 
tobacco manufacturers, specifically Philip Morris, Lorillard, Brown Williamson Tobacco Corporation ("Brown Williamson"), and RJR[2]
entered into a MSA. These tobacco companies are referred to in the MSA as Original Participating Manufacturers or OPMs.
 {¶ 3} The MSA settled the parties' disputes concerning the Settling States charges that the tobacco companies had conspired to conceal from the American public health risks associated with smoking and that they had intentionally targeted minors through their marketing and promotional efforts. The Ohio Attorney General signed the MSA on behalf of the state of Ohio on December 2, 1998. Since that time, at least 40 additional tobacco manufacturing companies, referred to in the MSA as Subsequent Participating Manufacturers or SPMs, have agreed to also be bound and to make payments under the MSA (collectively, "Participating Manufacturers" or "PMs").
 {¶ 4} Inter alia, the MSA restricts the advertising, promotion, marketing, and other practices of the PMs and requires them to make substantial yearly payments into perpetuity to the Settling States. These payments are paid into an escrow account by April 15 of each year and an Independent Auditor, currently PricewaterhouseCoopers, L.L.P., calculates the amount which each of the Settling States shall receive according to the percentages set forth in Exhibit A of the MSA. The Independent Auditor begins the calculation with an agreed upon annual aggregate payment established under MSA § IX(b) and (c). The amount paid by each PM depends upon its market share, which is calculated by that company's share of the total number of cigarettes sold nationally. *Page 4 
The PMs' amount due is then subject to certain allocations, offsets, reductions, and adjustments under MSA § IX(j).
 {¶ 5} One of the adjustments is the Non-Participating Manufacturer's Adjustment ("NPM adjustment"), which was designed to address the PMs' concern that they would suffer a competitive disadvantage compared with those cigarette manufacturers that did not sign the MSA and do not restrict their advertising or pay for health costs. The NPM adjustment allows PMs to reduce the amount they pay into the account for any year in which they lose market share to the Non-Participating Manufacturers ("NPMs") by an amount calculated by the Independent Auditor pursuant to a formula set forth in the MSA, and allocated to each Settling State by a fixed percentage for each state set forth in the MSA.
 {¶ 6} To calculate whether or not a PM has lost market share, the Independent Auditor first compares the aggregate market share of the PMs for the year in question with their aggregate market share for the base year, or 1997. If the aggregate market share has decreased by more than two percent, then the PMs have suffered a "market share loss." MSA § IX(d)(1)(A) and (B)(iii). Any time that the market share loss by the PMs is greater than zero, the MSA provides that a nationally recognized firm of economic consultants ("Firm") must determine whether or not the disadvantages experienced as a result of the MSA provisions were a "significant factor" contributing to a market share loss by the PMs for the year in question. MSA § IX(d)(1)(C). The Firm's determination of whether or not the losses were a significant factor is made on a nationwide basis and is final and non-appealable. MSA § IX(d)(1)(C). *Page 5 
 {¶ 7} If such a determination is made by the Firm, that the implementation of the MSA was a significant factor, then MSA § IX(d)(2)(A) provides that the Independent Auditor must apply the NPM adjustment, which reduces the amount the PMs must pay, in accordance with a reduction formula set forth in the MSA consisting of a specified percentage reduction for each Settling State. However, MSA § IX(d)(2)(B) provides that no NPM adjustment shall be made with respect to a Settling State that:
 A Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such Settling State continuously had a Qualifying Statute * * * in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year; or (ii) if such Settling State enacted the Model Statute * * * for the first time during the calendar year immediately preceding the year in which the payment in question is due, continuously had the Model Statute in full force and effect during the last six months of such calendar year, and diligently enforced the provisions of such statute during the period in which it was in full force and effect.
 {¶ 8} If a Settling State satisfies both of the MSA § IX(d)(2)(C) conditions, the NPM adjustment is not applied to that state for that year. Any Settling State that does not satisfy the conditions has the NPM adjustment applied and the money that would have been applied to that state is reallocated for that year among the Settling States that satisfied the conditions. MSA § IX(d)(2)(C).
 {¶ 9} The Independent Auditor determined that the PMs experienced a market share loss in 2003 and the Firm, on March 27, 2006, determined that the implementation of the MSA had been a significant factor contributing to that loss. The Independent Auditor presumed that all states had diligently enforced its Qualifying Statute. The PMs concede that Ohio had a Qualifying Statute in effect, however, the *Page 6 
dispute herein involves whether or not Ohio diligently enforced its statute, R.C. 1346.01 to 1346.10. The state concedes that the Independent Auditor's determination to presume that all Settling States had diligently enforced their respective Qualifying Statute may be arbitrable, but asserts that Ohio diligently enforced its statute as provided in the MSA, and, thus, the PMs are not entitled to the NPM adjustment as to Ohio for 2003.
 {¶ 10} The Independent Auditor made a preliminary calculation and advised the PMs and the Settling States that it needed to be provided with an authoritative determination as to each Settling State as to whether that state had diligently enforced its Qualifying Statute. In the Independent Auditor's March 7, 2006 preliminary calculation for 2005, the Independent Auditor stated that it had received information from the PMs "denying that some Settling States have `continuously had a Qualifying Statute in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due [1999 — 2005], and diligently enforced the provisions of such statute during such entire calendar year' (subsection IX[d][2][B] of the MSA)." However, the PMs did not identify either how many or which of the Settling States that the PMs contend did not have a Qualifying Statute in effect or had not diligently enforced their respective statute. On the other hand, the Settling States asserted that they all had Qualifying Statutes that met the MSA requirements, and that each state had diligently enforced its statute. In the 2005 preliminary calculation, the Independent Auditor stated, as follows:
 * * * The Independent Auditor is not charged with the responsibility under the MSA of making a determination regarding this issue [whether a specific state had diligently enforced the statute]. More importantly, the Independent *Page 7 
Auditor is not qualified to make the legal determination as to whether any particular Settling State has "diligently enforced" its Qualifying Statute. Additionally, the Independent Auditor is aware of certain litigation that is ongoing related to this issue. Until such time as the parties resolve this issue or the issue is resolved by a trier of fact, the Independent Auditor will not modify its current approach to the calculation.
 {¶ 11} The Independent Auditor made its final determination on March 29, 2006, but did not repeat the previous language from the preliminary calculation regarding whether the Independent Auditor is qualified to make the determination, but did state that, until the issue had been resolved by a trier of fact, it would not modify its current approach to the calculation, that is, to presume that all Settling States had diligently enforced its Qualifying Statute. (See Letter, March 29, 2006, 4-5.)
 {¶ 12} The Independent Auditor presumed that all the Settling States had diligently enforced their statutes. The state contends that this presumption is required because diligent enforcement is a legal judgment which cannot be assumed adverse to a state. State ex rel. Bettman, Atty.Gen. v. Court of Common Pleas (1931), 124 Ohio St. 269, 277 (when a statute has been duly enacted a legal presumption exists that the highest law enforcement officer of the state is faithfully enforcing the statute).
 {¶ 13} The PMs contested the Independent Auditor's presumption, contending that the Independent Auditor should have presumed that no Settling State had diligently enforced its Qualifying Statute. On April 17, 2006, claiming an entitlement to the full NPM adjustment as to all states and disputing the Independent Auditor's presumption, RJR and Lorillard withheld approximately $755,000,000 from their annual MSA payments owed to Ohio and other states. Ohio's share of this amount is approximately $38,000,000. Philip Morris subsequently joined RJR and Lorillard in claiming an *Page 8 
entitlement to the NPM adjustment and sought a return of $22,000,000 it paid to Ohio from the escrow account. This withholding led the state to file the motions at issue here, including the state's motion to require the PMs make full payments under the MSA without any NPM adjustment, or, in essence, to release the escrowed amount (release motion), and a motion for a declaratory order regarding the diligent enforcement of Ohio's Qualifying Statute for 2003 and determining that Ohio is not subject to an NPM adjustment for 2003. The OPMs filed a motion to compel arbitration, in which the SPMs joined. The court granted the PMs' motion to compel and denied the state's release motion and denied as moot the state's motion for diligent enforcement determination. The state has appealed, raising the following assignments of error:
 FIRST ASSIGNMENT OF ERROR:
 The MSA Court erred in referring the Release Motion to arbitration.
 SECOND ASSIGNMENT OF ERROR:
 The MSA Court erred referring the DE Motion [diligent enforcement motion] to arbitration.
 {¶ 14} Generally, the standard of review for a decision denying or granting a motion to compel is whether the trial court abused its discretion. Tinker v. Oldaker, Franklin App. No. 03AP-671,2004-Ohio-3316, ¶ 18. In order to find that the trial court abused its discretion, with respect to questions of fact, we must find more than an error of law or judgment. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Most instances of an abuse of discretion result in decisions that are unreasonable as opposed to arbitrary and capricious. AAAA Ent., Inc. v. River Place *Page 9 Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157. A decision that is unreasonable is one that has no sound reasoning process to support it.
 {¶ 15} However, this court has recognized a split of authority regarding the standard of review. See Boggs v. Columbus Steel CastingsCo., Franklin App. No. 04AP-1239, 2005-Ohio-4783, ¶ 5 (recognizing split in authority). When an appeal presents questions of law regarding the interpretation and construction of contracts, we apply a de novo review.Peters v. Columbus Steel Castings Co., Franklin App. No. 05AP-308,2006-Ohio-382.
 {¶ 16} The role of the court when interpreting contracts, is to give effect to the intent of the parties to the agreement. Hamilton Ins.Serv., Inc. v. Nationwide Ins. Cos. (1999), 86 Ohio St.3d 270, 273. The court should examine the contract as a whole and presume that the intent of the parties is reflected in the language used in the contract.Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130, paragraph one of the syllabus.
 {¶ 17} A party cannot be compelled to arbitrate a dispute which he has not agreed to submit to arbitration. Henderson v. Lawyers Title Ins.Co., 108 Ohio St.3d 265, 2006-Ohio-906, ¶ 28. If a party has not signed an arbitration agreement, a presumption arises against arbitration.Council of Smaller Ent. v. Gates, McDonald Co. (1998),80 Ohio St.3d 661, 667.
 {¶ 18} The public policy in Ohio favors arbitration to settle disputes. ABM Farms, Inc. v. Woods (1998), 81 Ohio St.3d 498, 500, and there is a strong presumption in favor of arbitration. Sasaki v.McKinnon (1997), 124 Ohio App.3d 613, 616. However, even though Ohio public policy generally favors arbitration as a means to settle disputes, the policy will not be enforced where the arbitration clause cannot be *Page 10 
interpreted to cover the dispute. Gibbons-Grable Co. v. Gilbane Bldg.Co. (1986), 34 Ohio App.3d 170, 173. Thus, the issue is whether the state agreed to arbitrate these issues.
 {¶ 19} The assignments of error are related and shall be addressed together. By the first assignment of error, the state contends that the MSA court erred in referring its release motion to arbitration. In its release motion, the state sought an order requiring RJR, Lorillard, and Philip Morris[3] to make their full annual 2003 MSA payment, based on Settlement Agreements between the Settling States and RJR, Brown 
Williamson, and Lorillard in 2003.
 {¶ 20} By the second assignment of error, the state contends that the MSA court erred in referring the diligent enforcement determination motion to arbitration. The motion sought a declaratory judgment that, for calendar year 2003, Ohio had diligently enforced its Qualifying Statute and, therefore, was not subject to the NPM adjustment and sought an order that any PMs which had withheld payments to Ohio on that basis pay the sums owed, plus interest. The state argues that the MSA provides that the MSA court, not an arbitration panel, should be deciding whether Ohio diligently enforced its Qualifying Statute. The trial court denied as moot the diligent enforcement motion rather than ordering arbitration as the assignment of error suggests. However, in ordering the release motion to arbitration, the MSA court stated that the MSA § XI(c) arbitration panel would decide the diligent enforcement issue, thus, although denying the motion as moot, the issue was ordered to be arbitrated as part of the PMs' motion to compel. *Page 11 
 {¶ 21} The 2003 Settlement Agreements settled disputes regarding the NPM adjustment with respect to cigarettes shipped or sold during 1999, 2000, 2001, and 2002. The state argues that the OPMs released any claims to the NPM adjustment for 2003. The 2003 Settlement Agreements provide the following release language:
 [OPM] absolutely and unconditionally releases and forever discharges each Settling State from any and all claims that it ever had, now has, or hereafter can, shall or may have under Section IX(d) of the MSA with respect to Cigarettes shipped or sold during 1999, 2000, 2001, and 2002, including any effect such claims may have on future payments under the MSA.[4]
 {¶ 22} The state argues that, by this agreement, the OPMs released any claims to the NPM adjustment for 2003 because the PMs were not required to make any deposits for cigarettes shipped and sold in 2003 until April 2004. Ohio's enforcement activities in calendar year 2003 were limited to cigarettes shipped or sold in 2002 or earlier. Thus, the state argues that the OPMs released any right to dispute diligent enforcement in 2003 and any claim to a 2003 NPM adjustment. The state argues that the basis of the court's error is twofold: The court misapplied Fazio v. LehmanBros., Inc. (C.A.6, 2003), 340 F.3d 386, and that the language of MSA § XI(c) limits its scope to determinations made by the Independent Auditor and the Independent Auditor has not made any determinations regarding the issues raised in the release motion.
 {¶ 23} The trial court relied on the test enumerated inFazio, supra, where the court held: "A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." Fazio at 395, citing Ford v.NYLCare Health *Page 12 Plans of Gulf Coast, Inc. (C.A.5, 1998), 141 F.3d 243, 250-251. The trial court found that it could not construe the 2003 Settlement Agreements without reference to the underlying MSA because the Settlement Agreements refer to portions of the MSA or documents attached to the MSA. Thus, the MSA court concluded that the parties agreed to submit the matter to arbitration. Also, the RJR Settlement Agreement at ¶ 8 reserves the PMs' right to seek an NPM adjustment for the year 2003 and subsequent years.
 {¶ 24} The question involved in these assignments of error, is whether the MSA requires arbitration of the issue of whether Ohio diligently enforced its Qualifying Statute during the entire year and, therefore, is not subject to the NPM adjustment for 2003. The state contends that the issue of whether the Independent Auditor's presumption is correct is arguably an arbitrable issue, but that the MSA sets forth that the issue of whether Ohio has diligently enforced its Qualifying Statute is an issue for the MSA court to determine and is not subject to arbitration under the terms of the MSA.
 {¶ 25} MSA § XI(c) of the MSA provides for arbitration of certain controversies, as follows:
 Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The *Page 13 
arbitration shall be governed by the United States Federal Arbitration Act.
(Emphasis added.)
 {¶ 26} At issue here is who determines whether a state has diligently enforced its Qualifying Statute, the MSA court of each state or whether the MSA provides for arbitration of the diligent enforcement issue. While the MSA court has primary jurisdiction to enforce the MSA, there is an arbitration exception to that jurisdiction. The arbitration provision of the MSA is an exception to the jurisdiction of the MSA court, which has the primary enforcement responsibility of the MSA. See MSA § VII. MSA § VII(a) provides that the MSA court retains jurisdiction except as to matters within § IX(d), XI(c) and XVII(d), and Exhibit O.[5]
 {¶ 27} MSA § XI(a) provides that "an Independent Auditor shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto * * *." The NPM adjustment is one of the adjustments to the annual payment and the MSA language requires the Independent Auditor determine the adjustments to the annual payment. The MSA provides for arbitration of disputes that arise out of or relate to calculations made by the Independent Auditor.
 {¶ 28} MSA § IX(j) provides the steps that the Independent Auditor must take in calculating the PMs' annual payments. Clause "Sixth" in the process is the application of the NPM adjustment, as follows:
 (j) Order of Application of Allocations, Offsets, Reductions and Adjustments. *Page 14 
 The payments due under this Agreement shall be calculated as set forth below. The "base amount" referred to in clause "First" below shall mean (1) in the case of payments due from Original Participating Manufacturers, the base amount referred to in the subsection establishing the payment obligation in question; and (2) in the case of payments due from a Subsequent Participating Manufacturer, the base amount referred to in subsection (i)(2) for such Subsequent Participating Manufacturer. In the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause. (If clause "First" is inapplicable, the result of clause "First" will be the base amount of the payment in question prior to any offsets, reductions or adjustments.)
 First: the Inflation Adjustment shall be applied to the base amount of the payment being calculated;
 Second: the Volume Adjustment (other than the provisions of subsection (B)(iii) of Exhibit E) shall be applied to the result of clause "First";
 Third: the result of clause "Second" shall be reduced by the Previously Settled States Reduction;
 Fourth: the result of clause "Third" shall be reduced by the Non-Settling States Reduction;
 Fifth: in the case of payments due under subsections IX(c)(1) and IX(c)(2), the results of clause "Fourth" for each such payment due in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together to form such Settling State's Allocated Payment. In the case of payments due under subsection IX(i) that correspond to payments due under subsections IX(c)(1) or IX(c)(2), the results of clause "Fourth" for all such payments due from a particular Subsequent Participating Manufacturer in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together. (In the case of all other payments made *Page 15 
pursuant to this Agreement, this clause "Fifth" is inapplicable.);
 Sixth: the NPM Adjustment shall be applied to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2) (or, in the case of payments due from the Subsequent Participating Manufacturers, pursuant to subsection IX(d)(4));
 Seventh: in the case of payments due from the Original Participating Manufacturers to which clause "Fifth" (and therefore clause "Sixth") does not apply, the result of clause "Fourth" shall be allocated among the Original Participating Manufacturers according to their Relative Market Shares. In the case of payments due from the Original Participating Manufacturers to which clause "Fifth" applies: (A) the Allocated Payments of all Settling States determined pursuant to clause "Fifth" (prior to reduction pursuant to clause "Sixth") shall be added together; (B) the resulting sum shall be allocated among the Original Participating Manufacturers according to their Relative Market Shares and subsection (B)(iii) of Exhibit E hereto (if such subsection is applicable); (C) the Available NPM Adjustment (as determined pursuant to clause "Sixth") shall be allocated among the Original Participating Manufacturers pursuant to subsection IX(d)(3); (D) the respective result of step (C) above for each Original Participating Manufacturer shall be subtracted from the respective result of step (B) above for such Original Participating Manufacturer, and (e) the resulting payment amount due from each Original participating Manufacturer shall then be allocated among the Settling States in proportion to the respective results of clause "Sixth" for each Settling State. The offsets described in clauses "Eighth" through "Twelfth" shall then be applied separately against each Original Participating Manufacturer's resulting payment shares (on a Settling State by Settling State basis) according to each Original Participating Manufacturer's separate entitlement to such offsets, if any, in the calendar year in question. (In the case of payments due from Subsequent Participating Manufacturers, this clause "Seventh" is inapplicable.)
 {¶ 29} There are 13 steps total involved in the application of allocations, offsets, reductions, and adjustments. Clause "Sixth" involves the application of the NPM *Page 16 
adjustment to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2), or IX(d)(4) for SPMs. Thus, MSA § XI(c), the arbitration clause, which carves out of the court jurisdiction, contains a reference to § IX(j), which in turn refers to the NPM adjustment and determinations under § IX(d)(1) and (d)(2). MSA § IX(d)(1) discusses the calculation of the NPM adjustment for OPMs. MSA § IX(d)(2) discusses how the NPM adjustment is to be allocated among the Settling States and describes how the diligent enforcement determination is to be conducted and applied. This results in the NPM adjustment and its aspects being all matters which fall within the purview of the NPM mandatory arbitration calculation.
 {¶ 30} The Idaho District Court of the Fourth Judicial District summarized the calculation in Idaho v. Philip Morris, Inc. (Idaho Dist.Ct. June 30, 2006), No. CV OC 97 03239D, at 7-8, as follows:
 Thus, in sum, Section XI(c) — the MSA Arbitration clause, which is carved out from the general jurisdiction of state courts — references Section IX(j), which in turn refers to the NPM Adjustment and determinations under Sections IX(d)(1) and (d)(2). Following the bread crumbs back to Section IX(d)(1), we find that this section discusses the calculation of the NPM Adjustment for the OPMs, including the significant factor determination. Meanwhile, and most importantly, Section IX(d)(2) discusses how the NPM Adjustment is to be allocated among the Settling States and describes, in particular, how the diligent enforcement determination is to be conducted and applied. MSA § IX(d)(2)(B). The result being that the NPM Adjustment, its functioning, allocation, and application are all matters falling directly within the purview of — and specifically included within — the NPM mandatory arbitration mechanism.
 {¶ 31} While the state argues that this dispute does not involve the NPM adjustment, but only the issue of whether Ohio has diligently enforced its Qualifying Statute, the issues are related. The only references to diligent enforcement in the MSA *Page 17 
are in connection with determining the NPM adjustment. The diligent enforcement determination is inextricably connected to the NPM adjustment because it necessarily controls the outcome of any NPM adjustment. Thus, it is part of the NPM adjustment calculation and being a part of the calculation of that adjustment renders it an issue that arises out of or relates to calculations performed by, or any determinations made by the Independent Auditor and, thus, is subject to arbitration and an exception to the MSA court's jurisdiction.
 {¶ 32} The New Hampshire court summarized this analysis as well, inNew Hampshire v. Philip Morris USA (N.H.Super.Ct. June 5, 2006), No. 06-E-132, at 5, providing, as follows:
 * * * Therefore, as the arbitration clause specifically covers determinations and calculations relative to those items in [s]ubsection IX(j), and the claims and controversies relating to or arising out of them, and the NPM Adjustment is specifically mentioned in subsection IX(j), a dispute over the application of the NPM Adjustment, as this matter appears to be, ought to be submitted to arbitration in accordance with the MSA.
 {¶ 33} Pursuant to the MSA's plain language, we apply Ohio law to our resolution of this appeal. However, we find helpful the reasoning of the foregoing decisions from other states because they are based upon application of sound principles of contract interpretation; they are not based upon laws unique to those states. Further support for this conclusion can be found in the language of the parenthetical phrase of § XI(c), which gives examples of the types of disputes covered by the arbitration clause. Disputes which are arbitrable include "any dispute concerning the operation or *Page 18 
application of any of the adjustments * * * described in subsection IX(j) * * *." MSA § IX(j) describes the method for calculating the payments.[6]
 {¶ 34} In this case, the Independent Auditor calculated the annual payment due, but did not apply the NPM adjustment because it was presumed that the Settling States had all diligently enforced their Qualifying Statutes. The state argues that this means no determination or calculation was made because it was a presumption. However, MSA § IX(j) instructs that "[i]n the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause." Thus, the agreement requires the Independent Auditor to calculate the annual payments and, in performing those calculations, the agreement further requires that the Independent Auditor determine, based on the language of the agreement and the information it has been provided, whether to apply the NPM adjustment. In fact, even if information necessary to the calculation is missing, MSA § XI(d)(5)(A) directs the Independent Auditor to calculate the annual payments by employing an assumption for the missing information. In this case, the Independent Auditor determined that the NPM adjustment does not apply, in effect, reducing the payment by zero. Such a presumption, that the Settling States all diligently enforced their Qualifying Statutes, is a determination in this case. Although the Independent *Page 19 
Auditor stated it did not resolve the diligent enforcement issue, it nevertheless made a determination which was to presume diligent enforcement by all the Settling States.
 {¶ 35} While arbitration is a matter of contract, and a party cannot be required to submit to arbitration unless he has agreed to do so, in this case, the states agreed to arbitration of this dispute. The arbitration clause at issue here does limit itself to certain aspects of the contract. Many of the courts have concluded that the arbitration clause of the MSA is narrow in the overall scope of the MSA, or meaning that the MSA courts have the bulk of the responsibility of the MSA enforcement, but the language used in the clause is broad language. Even though the clause is narrow in that it does not encompass the entire MSA, within its confines, the clause is broad. Although the agreement limits the subject matter of the disputes that are arbitrable, it uses broad language in defining the scope of the disputes that fall within that subject matter, that any matter "arising out of or relatingto" determinations and calculations of the Independent Auditor. (Emphasis added.) We do not interpret the language of the arbitration clause to narrowly only cover disputes about the simple mathematics of the Independent Auditor's calculations. Courts must endeavor to give effect to all of the words in a contract. To interpret the arbitration clause here as only covering mathematical disputes, and not disputes about determinations as to which numbers will be used in completing the mathematical steps, would fail to give effect to the words "arising out of or relating to * * * any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments * * *)." MSA § XI (c). Thus, any issues arising out of or related to the determinations and calculations of the Independent Auditor are arbitrable and as we *Page 20 
determined above, the diligent enforcement issue is inextricably linked and related to the NPM adjustment calculation, which is subject to arbitration.
 {¶ 36} Thus, the issue of whether Ohio has diligently enforced its Qualifying Statute is inextricably linked to the calculation of the NPM adjustment and whether the PMs are entitled to the adjustment for 2003. We find the language of the MSA provides that the parties agreed to arbitrate the issue and that the 2003 Settlement Agreements integrated the MSA and also provided for arbitration. Since the release motion will necessarily involve the diligent enforcement issue, both issues will be arbitrated, and the assignments of error are not well-taken.
 {¶ 37} For the foregoing reasons, both of the state's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
SADLER, J., concurs.
WHITESIDE, J., concurs in part and dissents in part.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] The tobacco companies settled their disputes with Florida, Mississippi, Texas, and Minnesota on an individual basis.
[2] In July 2004, RJR and Brown Williamson merged. As part of the merger, RJR assumed Brown Williamson's obligations under the MSA.
[3] Philip Morris was originally not included in the motion, but was later added.
[4] RJR 2003 Agreement, ¶ 6. Brown Williamson and Lorillard agreements contain similar language.
[5] MSA § XI(c) is the arbitration provision in which disputes are placed within the jurisdiction of the arbitrators. MSA § IX(d) creates and defines the NPM adjustment.
[6] Every other MSA court has determined the issue of arbitration substantially similar to the decision of the common pleas court herein. Only two of the MSA courts have decided the issue differently, however, both of those courts were reversed on appeal. State ex rel. Stenehjem v.Philip Morris, Inc. (N.D.Dist.Ct. July 18, 2006), No. 09-98-C-03778 (Memorandum Opinion and Order); State ex rel. Stenehjem v. PhilipMorris, Inc. (2007), 732 N.W.2d 720; Louisiana v. Philip Morris,USA, Inc. (La.Dist.Ct. June 4, 2007), No. 1998-6473 (Order); Ieyoub v.Philip Morris, USA, Inc. (La.Ct.App. Apr. 30, 2008), No. CA 08-33.